**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| _____ ) | |
| LANXESS Corporation ) | |
| ) | |
| *Plaintiff,* ) | Court No. 20-00514 |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA; ) | |
| OFFICE OF THE UNITED STATES TRADE ) | |
| REPRESENTATIVE; ROBERT E. LIGHTHIZER, U.S. ) | |
| TRADE REPRESENTATIVE; U.S. CUSTOMS & ) | |
| BORDER PROTECTION; MARK A. MORGAN, U.S. ) | |
| CUSTOMS & BORDER PROTECTION ACTING ) | |
| COMMISSIONER, ) | |
| ) | |
| ) | |
| _____*Defendants.*_____ ) | |

## COMPLAINT

Plaintiff LANXESS Corporation ("LANXESS"), by and through its attorneys, alleges and states as follows:

1.     This action contests Defendants' unlawful imposition of a third round of tariffs on Chinese products covered by so-called "List 3" $200 Billion Trade Action. *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974 (Sept. 21, 2018).

2.     While Defendants' imposition of the third round of tariffs was purportedly intended to address facts from a prior investigation under Section 301 (19 U.S.C. § 2411) of the Trade Act of 1974 ("Trade Act"), in fact Defendants own public statements confirm that their actions in

promulgating List 3 were in retaliation for actions by China subsequent to the prior investigation. The imposition of these tariffs was therefore in violation of the requirements of Section 301.

3.     In addition, and as an independent and alternative basis for relief, Defendants' actions in promulgating List 3 were untimely and therefore *ultra vires*.   Under the Trade Act, the Office of the United States Trade Representative ("USTR") conducted an investigation into China's unfair intellectual property policies and practices pursuant to Section 301.   Defendants contend that it is this investigation that supports the imposition of the tariffs at issue, however, Section 304 of the Trade Act (19 U.S.C. § 2414) required USTR to determine what action to take, if any, within 12 months after initiation of that investigation.   But USTR failed to issue List 3 within that time limit. Further, USTR's "modification" authority under Section 307 of the Trade Act (19 U.S.C. § 2417) does not allow USTR to issue List 3 as it does not authorize USTR to expand the tariff actions taken timely pursuant to the original investigation.   Yet that is exactly what Defendants did here when they promulgated List 3 and imposed additional duties.  The statute permits USTR only to delay, taper, or terminate—not increase—the actions it has already taken.

4.     Defendant's actions in promulgating List 3 were also arbitrary, capricious, an abuse of discretion, contrary to law, and not in accordance with the rulemaking requirements of the Administrative Procedure Act ("APA").  *See* 5 U.S.C. §§ 553, 706.  USTR: (1) failed to provide sufficient opportunity for comment, *e.g.*, requiring interested parties to submit affirmative *and* rebuttal comments *on the same day* in the List 3 proceeding; (2) failed to consider relevant factors when making its decision, *e.g.*, undertaking no analysis of the supposed "increased burden" imposed on U.S. commerce from the unfair policies and practices that it originally investigated; and (3) failed to explain its actions in light of the record facts.  For example, despite receiving over 6,000 comments on List 3, USTR said absolutely nothing about how those comments shaped its

final promulgation of List 3.  USTR's actions reveal preordained decision-making that bears no resemblance to the standards that the APA demands.

5.      The Court should set aside Defendants' actions as *ultra vires* and otherwise contrary to law and should order Defendants to refund (with interest) any duties paid by Plaintiff pursuant to List 3.

## JURISDICTION

6.      The Court possesses subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(i)(1)(B), which confers "exclusive jurisdiction" to the Court over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." 28 U.S.C. § 1581(i)(1)(B).

## PARTIES

7.      Plaintiff LANXESS is a manufacturer of chemical intermediates, additives, specialty chemicals and plastics. Plaintiff has made numerous entries of 1,2-dibromo-2,4-dicyanobutane (IUPAC Name: 2-bromo-2-(bromomethyl)pentanedinitrile) that is used in a variety of applications, such as aqueous paints, polymer emulsions, joint cements, adhesives, dispersed pigments, waxes, polishes, inks, etc.   This product is classified under HTSUS subheading 2926.90.5050, which was subject to the additional *ad valorem* duties under List 3 until an exclusion was granted on April 24, 2020.  Since the exclusion expired on August 7, 2020, Plaintiff has paid Section 301 duties on all imports under this HTSUS subheading.  With over 20 sites in the United States, Plaintiff supports 1777 U.S. employees and a significant number of industry customers.

8.     Defendant United States of America received the disputed tariffs and is the statutory defendant under 5 U.S.C. § 702 and 28 U.S.C. § 1581(i)(1)(B).

9.     The Office of the USTR is an executive agency of the United States charged with investigating a foreign country's trade practices under Section 301 of the Trade Act and implementing "appropriate" responses, subject to the direction of the President. USTR conducted the Section 301 investigation at issue and made numerous decisions regarding List 3.

10.    Ambassador Robert E. Lighthizer currently holds the position of USTR and serves as the director of the Office of the USTR. In these capacities, he made numerous decisions regarding Lists 3 and 4.

11.    Defendant U.S. Customs & Border Protection ("CBP") is the agency that collects duties on imports, including Section 301 duty payments made by Plaintiff under List 3.

12.    Defendant Mark A. Morgan is the Acting Commissioner of CBP. In this capacity, he oversees CBP's collection of duties paid by Plaintiff under List 3.

## STANDING

13.    Plaintiff has standing to seek relief because it is "adversely affected or aggrieved by agency action within the meaning of" the APA. 5 U.S.C. § 702; *see* 28 U.S.C. § 2631(i) ("Any civil action of which the Court of International Trade has jurisdiction . . . may be commenced in the court by any person adversely affected or aggrieved by agency action within the meaning of Section 702 of title 5."). Tariffs imposed by Defendants pursuant to List 3 adversely affected and aggrieved Plaintiff because it was required to pay these unlawful duties.

## TIMELINESS OF THE ACTION

14.    A plaintiff must commence an action under 28 U.S.C. § 1581(i)(1)(B) "within two years after the cause of action first accrues." 28 U.S.C. § 2636(i).

15.     The instant action contests action taken by Defendants that resulted in the List 3 tariff action. *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974 (Sept. 21, 2018).

16.     Plaintiff's claims under List 3 accrued, at the absolute earliest, on September 21, 2018, when USTR published notice of List 3 in the *Federal Register*.

## RELEVANT LAW

17.     Section 301 of the Trade Act authorizes USTR to investigate a foreign country's trade practices. 19 U.S.C. § 2411(b). If the investigation identifies an "unreasonable or discriminatory" act, policy, or practice, USTR may take "appropriate" action, such as imposing duties on imports from the subject country. *Id.* § 2411(b), (c)(1)(B).

18.     Section 304 of the Trade Act provides USTR "shall" determine what action to take, if any, within 12 months after the initiation of the underlying investigation. *Id.* § 2414(a)(1)(B), (2)(B).

19.     Section 307 of the Trade Act (in pertinent part) allows USTR to "modify or terminate" an action taken pursuant to Section 301 of the Trade Act either when the "burden or restriction on United States commerce of the denial rights" or of the investigated acts, policies and practices has "increased or decreased" or when the action "is no longer appropriate." *Id.* § 2417(a)(1)(B), (C).

## PROCEDURAL HISTORY

### I.     USTR'S SECTION 301 INVESTIGATION

20.     On August 14, 2017, President Trump directed USTR to determine, consistent with Section 301(b) of the Trade Act (19 U.S.C. 2412(b)), whether to investigate China's "laws, policies,

practices, and actions that may be harming American intellectual property, innovation, and technology." *Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39,007 (Aug. 17, 2017). According to the President, certain Chinese "laws, policies, practices, and actions" on intellectual property, innovation, and technology "may inhibit United States exports, deprive United States citizens of fair remuneration for their innovations, divert American jobs to workers in China, contribute to our trade deficit with China, and otherwise undermine American manufacturing, services, and innovation." *Id.*

21.     On August 18, 2017, USTR formally initiated an investigation into "whether acts, policies, and practices of the Government of China related to technology transfer, intellectual property, and innovation are actionable" under Section 301(b) of the Trade Act. *Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 82 Fed. Reg. 40,213 (Aug. 24, 2017).

22.     On March 22, 2018, USTR released a report detailing the finding of its investigation. OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *Findings of the Investigation Into China's Acts, Policies, And Practices Related to Technology Transfer, Intellectual Property, and Innovation Under Section 301 of The Trade Act of 1974* (Mar. 22, 2018), *available at* https://ustr.gov/sites/default/files/Section%20301%20FINAL.PDF. USTR found that certain "acts, policies, and practices of the Chinese government related to technology transfer, intellectual property, and innovation are unreasonable or discriminatory and burden or restrict U.S. commerce." *Id.* at 17. USTR based its findings on (1) China's use of foreign ownership restrictions, foreign investment restrictions, and administrative licensing and approval processes to pressure technology transfers from U.S. to Chinese companies, *id.* at 45; (2) China's use of licensing processes to transfer technologies

from U.S. to Chinese companies on terms that favor Chinese recipients, *id.* at 48; (3) China's facilitation of systematic investment in, and acquisition of, U.S. companies and assets by Chinese entities to obtain technologies and intellectual property for purposes of large-scale technology transfer, *id.* at 147; and (4) China's cyber intrusions into U.S. computer networks to gain access to valuable business information, *id.* at 171.  In its report, USTR did not quantify the burden or restriction imposed on U.S. commerce by the investigated practices.

23.    On the same date, USTR published a "Fact Sheet" stating that "[a]n interagency team of subject matter experts and economists estimates that China's policies result in harm to the U.S. economy of at least $50 billion per year." OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *Section 301 Fact Sheet* (Mar. 22, 2018), *available at* https://ustr.gov/about-us/policy-offices/press-office/fact-sheets/2018/march/section-301-fact-sheet ("Fact Sheet"). USTR also indicated that, consistent with a directive from President Trump, it would "propose additional tariffs" of 25% *ad valorem* "on certain products of China, with an annual trade value commensurate with the harm caused to the U.S. economy resulting from China's unfair policies." *Id.*; *see Actions by the United States Related to the Section 301 Investigation of China's Laws, Policies, Practices, or Actions Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 13,099 (Mar. 27, 2018) (President Trump's directive).

## II.    LISTS 1 AND 2

24.    Between April and August 2018 (*i.e.*, within the 12-month statutory deadline from the initiation of the investigation in August 2017, *see* 19 U.S.C. § 2414(a)(2)(B)), Defendants undertook a series of actions to remedy the estimated harm to the U.S. economy caused by the investigated unfair practices, ultimately imposing duties on approximately $50 billion of imports

from China covered by the so-called List 1 ($34 Billion Trade Action) and List 2 ($16 Billion Trade Action).

25.     On April 6, 2018, USTR published notice of its intent to impose an additional duty of 25 percent on a list of products of Chinese origin pursuant to Section 301(b) and (c) of the Trade Act. *Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14,906, 14,907 (Apr. 6, 2018).  The proposed list covered 1,333 tariff subheadings with a total value of approximately $50 billion in terms of estimated annual trade value for calendar year 2018.  *Id.* at 14,907.  In a related press release, USTR explained that the proposed list of products was "based on extensive interagency economic analysis and would target products that benefit from China's industrial plans while minimizing the impact on the U.S. economy" and that it chose $50 billion because it was "commensurate with an economic analysis of the harm caused by China's unreasonable technology transfer policies to the U.S. economy, as covered by USTR's Section 301 investigation." OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *Under Section 301 Action, USTR Releases Proposed Tariff List on Chinese Products* (Apr. 3, 2018), *available at* https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/april/under-section-301-action-ustr.

26.     On June 20, 2018, USTR published a notice of action, imposing an additional 25% duty on 818 tariff subheadings with an approximate annual trade value of $34 billion, known as List 1. *Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710 (June 20, 2018). The duty took effect on July 6, 2018.

27.     At the same time that it finalized List 1, USTR announced its intent to impose a 25% *ad valorem* duty on a second proposed list of 284 tariff subheadings with an approximate annual trade value of $16 billion in order to "maintain the effectiveness of a $50 billion trade action" that was grounded in its Section 301 investigation and determined by USTR to be an appropriate level to address China's unfair practices, known as List 2. *Id.* at 28,711-12.

28.     On August 16, 2018, USTR published the final list of products subject to an additional duty of 25% *ad valorem* in List 2, comprising 279 tariff subheadings with an approximate annual trade value of $16 billion." *Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823, 40,823-24 (Aug. 16, 2018).

## III.     **LISTS 3 and 4**

### A.  **LIST 3**

29.     Subsequent to the actions imposing duties on products on Lists 1 and 2, Defendants significantly expanded the scope of products covered by "section 301 tariffs" to cover imports worth more than $500 billion—10 times the amount it had deemed "commensurate" with the findings of USTR's original investigation.   These actions were not based on or supported by the original section 301 investigation and were incommensurate with the findings of that investigation according to USTR's own Fact Sheet.  In fact, these additional tariff actions were in response to actions taken by China subsequent to the section 301 investigation.  As such. the section 301 investigation cannot be the basis for these actions.

30.     After President Trump directed USTR in April 2018 to consider imposing duties on $50 billion in Chinese products, China threatened to impose retaliatory duties on the same value of imports from the United States.  In response, President Trump instructed USTR to "consider

whether $100 billion of additional tariffs would be appropriate under Section 301" in light of "China's unfair retaliation." THE WHITE HOUSE, *Statement from Donald J. Trump on Additional Proposed Section 301 Remedies* (Apr. 5, 2018), *available at https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-additional-proposed-section-301-remedies/*.

31.     When USTR finalized List 1 in mid-June 2018, President Trump warned China that he would consider imposing additional tariffs on Chinese goods if China retaliated against the United States.  *See, e..g.*, Vicki Needham & Max Greenwood, *Trump Announces Tariffs on $50 Billion in Chinese Goods*, THE HILL (June 15, 2018), *available at* https://thehill.com/homenews/administration/392421-trump-announces-tariffs-on-50-billion-in-chinese-goods ("The president said the United States will pursue additional tariffs if China retaliates 'such as imposing new tariffs on United States goods, services or agricultural products; raising non-tariff barriers; or taking punitive actions against American exporters or American companies operating in China.'").

32.     Following through on his warning, on June 18, 2018, President Trump formally directed USTR to identify $200 billion worth of Chinese goods for additional tariffs at a rate of 10 percent—despite USTR having not yet implemented List 1 and List 2 or an investigation on China's action that was the basis for this U.S. action.  President Trump acknowledged that China's threatened retaliatory "tariffs on $50 billion worth of United States exports" motivated his decision. THE WHITE HOUSE, *Statement from the President Regarding Trade with China* (June 18, 2018), *available at* _ https://www.whitehouse.gov/briefings-statements/statement-president-regarding-trade-china-2/ ("China has determined that it will raise tariffs on $50 billion worth of United States exports . . . .  This latest action by China clearly indicates its determination to keep the United

States at a permanent and unfair disadvantage, which is reflected in our massive $376 billion trade imbalance in goods. This is unacceptable.").

33.     Acknowledging the purpose of the President's directive, USTR stated that it would design the newly proposed duties to address China's threatened retaliatory measures, rather than any of the harms identified in its Section 301 investigation. OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *USTR Robert Lighthizer Statement on the President's Additional China Trade Action* (June 18, 2018), *available at https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/june/ustr-robert-lighthizer-statement-0* (stating that, although Lists 1 and 2 "were proportionate and responsive to forced technology transfer and intellectual property theft by the Chinese" identified in the Section 301 investigation, USTR would prepare a third list of products to offset the retaliatory and "unjustified tariffs" that China may impose to target "U.S. workers, farmers, ranchers, and businesses.").

34.     Despite these warnings, China retaliated by imposing 25% *ad valorem* tariffs on $50 billion in U.S. goods implemented in two stages of $34 billion and $16 billion on the same dates the United States began collecting its own 25% tariffs under List 1 (July 6, 2018) and List 2 (August 23, 2018).

35.     About a week after China imposed its first round of retaliatory duties, USTR published its proposed notice of action to "modify the action in this investigation by maintaining the original $34 billion action and the proposed $16 billion action, and by taking a further, supplemental action" in the form of an additional 10 percent *ad valorem* duty on a list of Chinese products with an annual trade value of approximately $200 billion. *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg.

33,608, 33,609 (July 17, 2018).  USTR invoked Section 307(a)(1)(C) of the Trade Act, pursuant to which USTR "may modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, . . . if . . . such action is being taken under [Section 301(b)] of this title and is no longer appropriate." *Id*. (citing 19 U.S.C. § 2417(a)(1)(c)).  USTR initially set a deadline of August 17, 2018 for initial comments; August 20-23, 2018 for a public hearing; and August 30, 2018 for rebuttal comments. *Id*. at 33,608.

36.     In its notice, USTR confirmed that it had relied on China's decision to impose "retaliatory duties" as the primary basis for its proposed action. *Id*. at 33,609 (asserting as justification "China's response to the $50 billion action announced in the investigation and its refusal to change its acts, policies, and practices").  USTR explicitly tied the $200 billion in its proposed action to the level of retaliatory duties imposed by China on U.S. imports, noting that "action at this level is appropriate in light of the level of China's announced retaliatory action ($50 billion) and the level of Chinese goods imported into the United States ($505 billion in 2017)." *Id.*; *see also id.* (Because "China's retaliatory action covers a substantial percentage of U.S. goods exported to China ($130 billion in 2017)," "the level of the U.S. supplemental action must cover a substantial percentage of Chinese imports.").  Significantly, although it pointed to China's retaliatory measures, USTR did not identify any increased burdens or restrictions on U.S. commerce resulting from the unfair practices that USTR had investigated. *See id.*

37.     USTR's contemporaneous press statements further confirmed that China's retaliatory duties motivated its proposed action.  Ambassador Lighthizer stated that the proposed action came "[a]s a result of China's retaliation and failure to change its practice." Office of the United States Trade Representative, *Statement by U.S. Trade Representative Robert*

*Lighthizer on Section 301 Action* (July 10, 2018), *available at* https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/july/statement-us-trade-representative.

38.     On August 1, 2018, Ambassador Lighthizer announced that, in light of China's retaliatory duties, USTR would propose to increase the additional duty from 10% to 25% *ad valorem*. Rather than addressing the practices in the section 301 investigation, he stated that China "[r]egrettably . . . has illegally retaliated against U.S. workers, farmers, ranchers and businesses." OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *Statement by U.S. Trade Representative Robert Lighthizer on Section 301 Action* (Aug. 1, 2018), *available at* https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/august/statement-us-trade-representative.     USTR Lighthizer made clear that the $200 billion list was "in response to China's decision to cause further harm to U.S. workers, farmers, and businesses by imposing retaliatory duties on U.S. goods." *Id.*

39.     Shortly thereafter, USTR, at the direction of President Trump, formally proposed "raising the level of the additional duty in the proposed supplemental action from 10 percent to 25 percent." *Extension of Public Comment Period Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 38,760, 38,760 (Aug. 7, 2018).  USTR also set new dates for a public hearing over six days ending on August 27, 2018. *See id.*; *see also* OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *Public Hearings on Proposed Section 301 Tariff List* (Aug. 17, 2018) (modifying hearing schedule), *available at* https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/august/public-hearings-proposed-section-301.

40.     At the same time, USTR adjusted the deadlines for the submission of written comments, setting September 6, 2018—less than a month later—as the new deadline for both *initial and rebuttal* comments from the public. 83 Fed. Reg. at 38,761.  That adjustment, deviating

from its past practices, prevented both USTR and the public from considering initial comments at the hearing, and left insufficient time for interested parties to review and respond to the initial comments filed by other parties. USTR also limited each hearing participant to five minutes. Docket No. USTR-2018-0026, https://beta.regulations.gov/document/USTR-2018-0026-0001. Despite those obstacles, approximately 350 witnesses appeared at the six-day hearing, and the public submitted over 6,000 comments. *Id.*

41.     Two months after USTR first published its proposal to target an additional $200 billion in trade, *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 33,608, 33,609 (July 17, 2018) and merely 11 days after receiving the over 6000 comments from the public,   President Trump announced that he had directed USTR "to proceed with placing additional tariffs on roughly $200 billion of imports from China." THE WHITE HOUSE, *Statement from the President* (Sep. 17, 2018) https://www.whitehouse.gov/briefings-statements/statement-from-the-president-4/.   Once again, the President made clear that China's response to the $50 billion tariff action (i.e., Lists 1 and 2 duties) motivated his decision, and he immediately promised to pursue "phase three" of the plan— an *additional $267 billion tariff action*—"if China takes retaliatory action against our farmers or other industries." *Id.*

42.     Following the President's announcement, USTR published the final List 3 of products subject to an additional duty. 83 Fed. Reg. at 47,974.  USTR imposed a 10% *ad valorem* tariff that was set to increase automatically to 25% on January 1, 2019. *Id.*  USTR determined that the List 3 duties would take effect on September 24, 2018. *Id.*  USTR did not address any of the

over 6,000 comments that it received or any of the testimony provided by roughly 350 witnesses. *Id.*

43.    As legal support for its action, USTR for the first time cited Section 307(a)(1)(B) of the Trade Act, which provides that USTR "may modify or terminate any action, subject to the specific direction . . . of the President . . . taken under Section 301 if . . . the burden or restriction on United States commerce of the denial of rights, or of the acts, policies, or practices, that are the subject of such action has increased or decreased." *Id.* (brackets omitted).   USTR stated that the relevant burden "continues to increase, including following the one-year investigation period," adding that "China's unfair acts, policies, and practices include not just its specific technology transfer and IP polices referenced in the notice of initiation in the investigation, but also China's subsequent defensive actions taken to maintain those policies." *Id.*   USTR also cited Section 307(a)(1)(C) of the Trade Act, arguing that China's response to the $50 billion tariff action "has shown that the current action no longer is appropriate" because "China openly has responded to the current action by choosing to cause further harm to the U.S. economy, by increasing duties on U.S. exports to China." *Id.* at 47,975.

44.    In the months that followed, China and the United States attempted to resolve their differences through trade negotiations.   Based on the progress made with China in those negotiations, the Trump Administration announced in December 2018, and again in February 2019, that it would delay the scheduled increase in the List 3 duty rate from 10% to 25%. *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 65,198 (Dec. 19, 2018); *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 7,966 (Mar. 5, 2019).

45.     In May 2019, after the trade negotiations fell apart, USTR announced its intent to raise the tariff rate on List 3 goods to 25%, effective either May 10, 2019 or June 1, 2019, depending on the day of export. *See Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 20,459 (May 9, 2019) ("*List 3 Rate Increase Notice*"); *see also Implementing Modification to Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 21,892 (May 15, 2019).  The notice cited China's decision to "retreat from specific commitments agreed to in earlier rounds" of negotiations as the basis for the increase in the duty rate. *List 3 Rate Increase Notice*, 84 Fed. Reg. at 20,459.   USTR did not seek public comment but rather simply announced that the increase in the tariff would occur. *Id.*

46.     Recognizing that List 3 would cause substantial harm to U.S. companies and consumers, as well as the U.S. economy, USTR in June 2019 invited the public to seek exclusions from List 3 duties on a product-specific basis. *Procedures for Requests to Exclude Particular Products From the September 2018 Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 29,576 (June 24, 2019).

47.     On September 27, 2019, Plaintiff requested an exclusion for 1,2-dibromo-2,4-dicyanobutane (IUPAC Name: 2-bromo-2-(bromomethyl)pentanedinitrile) it imports under HTSUS subheading 2926.90.5050.  It took the USTR eight months to grant the exclusion, during which time Plaintiff continued to pay substantial amount of Section 301 duties on this product and/or other imports. *Notice of Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 85 Fed. Reg. 23,122, 23,125 (Apr. 24, 2020), *as amended*, *Notice of Product Exclusions: China's Acts, Policies, and Practices*

*Related to Technology Transfer, Intellectual Property, and Innovation*, 85 Fed. Reg. 32,094 (May 28, 2020).  Although the exclusion applies retroactively as of September 24, 2018, Plaintiff has yet to receive the vast majority of its entitled refunds from CBP.

48.    Moreover, the extension expired on August 7, 2020.  *See Notice of Product Exclusion Extensions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 85 Fed. Reg. 48,600 (Aug. 11, 2020) (not including HTSUS subheading 2926.90.5050).  Since that time, Plaintiff has paid List 3 duties on all entries of products made under HTSUS subheading 2926.90.5050.

## B.  LIST 4

49.    On May 17, 2019, a mere eight days after it published notice of its decision to increase the duty rate on imports covered by List 3, USTR announced its intent to proceed with yet another list—List 4—covering even more products subject to additional duties. Under USTR's proposal, List 4 would impose an additional duty of 25% *ad valorem* on products worth $300 billion. *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 22,564, 22,564 (May 17, 2019).  USTR explained that its decision was motivated by China's "retreat[] from specific commitments made in previous [negotiating] rounds [and] announce[ment of] further retaliatory action against U.S. commerce." *Id.*

50.    Similar to the process it followed for List 3, USTR invited the public to comment on proposed List 4 and participate in a hearing. *Id.* The public submitted nearly 3,000 comments. Docket No. USTR-2019-0004, https://beta.regulations.gov/document/USTR-2019-0004-0001. Despite the opportunity to comment, the timeline for participation in the hearing left little room for meaningful input: USTR required witnesses to submit drafts of their testimony by June 10,

2019, seven days before the deadline for fully developed written comments, and then it again limited witnesses to five minutes of testimony at the hearing. *Id.*

51.     On August 1, 2019, citing China's failure to follow through on agricultural purchases from the United States and to reduce exports of fentanyl flowing into the United States, an issue totally unrelated to and not addressed by the section 301 investigation, President Trump announced that the List 4 tariffs would become effective September 1, 2019 at a rate of 10% *ad valorem*. @realDonaldTrump, TWITTER (Aug. 1, 2019, 1:26 PM EDT), https://twitter.com/real DonaldTrump/status/1156979446877962243 (noting a "small additional Tariff of 10% on the remaining 300 Billion Dollars of goods and products coming from China into our Country").

52.     On August 20, 2019, USTR published a final notice adopting List 4 in two tranches. *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 43,304 (Aug. 20, 2019). List 4A would impose a 10% *ad valorem* duty on goods worth roughly $120 billion, effective September 1, 2019. *Id.* at 43,304.  List 4B would impose a 10% *ad valorem* duty on the remaining goods (with limited exclusions "based on health, safety, national security, and other factors"), effective December 15, 2019. *Id.* at 43,305.  Once again, USTR did not address any of the nearly 3,000 comments submitted or any of the testimony provided by witnesses, other than to claim that its determination "takes account of the public comments and the testimony." *Id.*

53.     As legal support for its action, USTR again cited Section 307(a)(1)(B) and (C) of the Trade Act, stating that it may modify its prior action taken pursuant to Section 301 of the Trade Act if (1) "[t]he burden or restriction on United States commerce" imposed by the investigated foreign country practice "has increased or decreased," or (2) "the action . . . is no longer appropriate." *Id.* at 43,304.  But instead of explaining how the burden on U.S. commerce from the

practices that were the subject of USTR's section 301 investigation "continued to increase", USTR merely pointed to "China's subsequent defensive actions taken to maintain those unfair acts, policies, and practices as determined in that investigation," including retaliatory tariffs on U.S. imports, retreating from commitments during negotiations, and devaluing its currency. *Id.*

54.     Just ten days later, USTR published notice of its decision to increase the tariff rate that would apply to goods covered by List 4A and List 4B from 10% to 15%. *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 45,821 (Aug. 30, 2019). USTR explained that it increased the tariff rate because, shortly after it finalized List 4A and List 4B, "China responded by announcing further tariffs on U.S. goods." *Id.* at 45,822. USTR once again cited China's retreat from its negotiation commitments and devaluation of its currency as grounds for its action. *Id.*

55.     On December 18, 2019, as a result of reaching an agreement with China, USTR published notice that it would "suspend indefinitely the imposition of additional duties of 15 percent on products of China covered by" List 4B. *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 69,447 (Dec. 18, 2019). USTR also stated its intent to reduce the tariff rate applicable to products covered by List 4A, *id.*, an action that ultimately became effective on February 14, 2020, when USTR halved the applicable duty rate on products of List 4A from 15% to 7.5%, *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 85 Fed. Reg. 3,741 (Jan. 22, 2020).

56.     The duties imposed on products covered by List 4A remain in effect as of the date of this Complaint.

## STATEMENT OF CLAIMS

### COUNT ONE

### (DECLARATORY JUDGMENT—VIOLATION OF THE TRADE ACT OF 1974)

57.     Paragraphs 1 through 56 are incorporated herein by reference.

58.     The Declaratory Judgment Act authorizes any court of the United States to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

59.     The actions of the Defendants in imposing the List 3 tariffs violate the Trade Act.

60.     Pursuant to Section 301 of the Trade Act, USTR may impose tariffs when it determines that "an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce, and action by the United States is appropriate." 19 U.S.C. § 2411(b). USTR issued List 3 based on China's imposition of duties on U.S. products. The USTR has never conducted a section 301 investigation on these actions by China.  Thus, the legally necessary predicate to its action giving rise to List 3 never occurred.

61.     Assuming *arguendo* that USTR could base its List 3 action on China's actions after the conclusion of the Section 301 investigation, Section 304 of the Trade Act requires USTR to "determine what action, if any," to take within "12 months after the date on which the investigation is initiated." 19 U.S.C. § 2414(a)(1)(B), (2)(B).  USTR's action giving rise to List 3 occurred in September 2018, well over 12 months after USTR initiated the allegedly underlying Section 301 investigation (August 18, 2017).

62.     In addition, and as a separate and alternative basis for relief, promulgation of List 3 was not consistent with Section 307 of the Trade Act, which authorizes USTR to "modify or terminate" an action taken pursuant to Section 301(b) of the Trade Act when the burden imposed on U.S. commerce from the foreign country's investigated unfair acts, policies, or practices increases or decreases. 19 U.S.C. § 2417(a)(1)(B).  Section 307 of the Trade Act does not permit Defendants to increase tariffs or to impose tariffs on new products especially for reasons unrelated to the acts, policies, or practices that USTR investigated pursuant to Section 301 of the Trade Act. Congress did not authorize USTR to use the finding in one case to impose tariffs for other unrelated reasons.

63.     Section 307 of the Trade Act also authorizes USTR to "modify or terminate" an action taken pursuant to Section 301(b) of the Trade Act if the initial action taken by USTR "is no longer appropriate." 19 U.S.C. § 2417(a)(1)(C).  Section 307 of the Trade Act does not authorize Defendants to *increase* tariff actions that are no longer "appropriate," but rather only to delay, taper, or terminate such actions.

64.     By imposing new tariffs on new products in retaliation for actions of China that post-dated the original Section 301 investigation, and by doing so outside of the time limit required by the Trade Act, Defendants have acted in excess of the authority granted under Section 301 in imposing the List 3 tariffs.  The improper imposition of such tariffs has directly and proximately caused harm to Plaintiff. Plaintiff is therefore entitled to a declaratory judgment that Defendants' actions giving rise to List 3 are *ultra vires* and contrary to law.

## **COUNT TWO**

## **(VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AND THE DUE PROCESS CLAUSE OF THE U.S. CONSTITUTION)**

65.     Paragraphs 1 through 64 are incorporated by reference.

66.     Section 706 of the APA authorizes the Court to hold unlawful and set aside an agency action that is: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence." 5 U.S.C. § 706(2).

67.     Defendants exceeded their statutory authority under the Trade Act in promulgating List 3, and therefore acted "not in accordance with the law" and "in excess of statutory authority" for the reasons set forth in Count One.  In addition, Defendants acted contrary to constitutional right and violated the Due Process Clause of the U.S. Constitution by depriving Plaintiff of its property interests without reasonable notice or an opportunity to be heard.

68.     Defendants also improperly imposed the List 3 tariffs without observing procedures required by law.  Section 553 of the APA requires a covered agency to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c). "After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." *Id.* USTR is a covered agency and, therefore, must follow the APA's rulemaking requirements. *See Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1281 (Ct. Int'l Trade 2019).

69.     Defendants also violated the APA's rulemaking requirements to provide for a meaningful opportunity for comment. *See* 5 U.S.C. § 553(c). For example, Defendants set the same deadline (September 6, 2018) for both written comments and rebuttal comments, which deprived interested parties an opportunity to review the initial comments and to provide meaningful responses.

70.     Defendants also defied the APA requirement to consider the "relevant matter presented" and to incorporate into the adopted rule a "concise general statement' of the "basis and purpose."  *See* 5 U.S.C. § 553(c).   For example, Defendants received 6,000 comments but made no reference to any specific comments and how they shaped the coverage of List 3.  Indeed, it is unclear how Defendants reviewed the extensive comments as List 3 was published in the *Federal Register* within 15 days after the comment period.

71.     Defendants failure to meaningfully consider relevant factors and to adequately explain their rationale when making their decisions is in violation of the law. *See* 5 U.S.C. § 706(2)(a); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (holding that the arbitrary and capricious standard requires an agency to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made") (internal citation omitted).  For example, Defendants provided no evidence for any asserted "increased burden" from China's intellectual property policies and practices that were the subject of USTR's Section 301 investigation.

72.     Defendants therefore promulgated List 3 in an arbitrary and capricious manner that violated Section 706 of the APA. Additionally, Defendants' preordained decision-making offended the rulemaking requirements under Section 553 of the APA and resulted in the unlawful imposition of tariffs on imports covered by List 3.

### DEMAND FOR JUDGMENT AND PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court

(1)     declare that Defendants' actions resulting in tariffs on products covered by List 3 are unauthorized by, and contrary to, the Trade Act;

(2)     declare that Defendants arbitrarily and unlawfully promulgated List 3 in violation of the APA;

(3)     vacate the List 3 rulemaking;

(4)     order Defendants to refund, with interest, any duties paid by Plaintiff pursuant to List 3;

(5)     permanently enjoin Defendants from applying List 3 against Plaintiff and collecting any duties from Plaintiff pursuant to List 3;

(6)     award Plaintiff its costs and reasonable attorney fees; and grant such other and further relief as may be just and proper.

Respectfully submitted,

/s/ Kenneth G. Weigel
Kenneth G. Weigel

September 18, 2020

ALSTON & BIRD LLP
950 F Street, NW
Washington, DC 20004
Tel: 202-239-3490
*Counsel to LANXESS Corporation*

**CERTIFICATE OF SERVICE**

*LANXESS Corporation v. The United States et. al, Court No. 1:20-cv-00514*

I hereby certify on this 18th day of September 2020, I have served a copy of the following documents via certified mail, return receipt requested, on the parties listed below, unless otherwise noted: Summons (Form 4), Complaint, Information Statement (Form 5), Notices of Appearance (Form 11), and Corporate Affiliations and Financial Interest (Form 13):

| | |
|---|---|
| Attorney-In-Charge<br>International Trade Field Office<br>Commercial Litigation Branch<br>U.S. Department of Justice<br>26 Federal Plaza<br>New York, NY 10278 | General Counsel Joseph L. Barloon<br>Office of the General Counsel<br>Office of the U.S. Trade Representative<br>600 17th Street, NW<br>Washington, DC 20006 |
| Attorney-In-Charge<br>Commercial Litigation Branch U.S.<br>Department of Justice<br>1100 L Street, NW<br>Washington, DC 20530 | Chief Counsel Scott K. Falk<br>Office of Chief Counsel<br>U.S. Customs & Border Protection<br>1300 Pennsylvania Ave., NW<br>Washington, DC 20229 |

/s/ Kenneth G. Weigel
Kenneth G. Weigel